**E-FILED**
**CNMI SUPREME COURT**
E-filed: Sep 23 2024 04:24PM
Clerk Review: Sep 23 2024 04:25PM
Filing ID: 74558722
Case No.: 2022-SCC-0016-CIV
Judy Aldan



IN THE

# Supreme Court

OF THE

# Commonwealth of the Northern Mariana Islands

---

**SECUNDINA UNTALAN PANGELINAN AND SELINA MARIE PANGELINAN,**
*Plaintiffs-Appellees,*

*v.*

**JOHN SABLAN PANGELINAN,**
*Defendant-Appellant.*

**Supreme Court No. 2022-SCC-0016-CIV**

---

**SLIP OPINION**

**Cite as: 2024 MP 5**

Decided September 23, 2024

———————

ASSOCIATE JUSTICE PERRY B. INOS
JUSTICE PRO TEMPORE ROBERT J. TORRES, JR.
JUSTICE PRO TEMPORE WESLEY M. BOGDAN

———————

Superior Court Civil Action No. 17-0067
Associate Judge Joseph N. Camacho, Presiding

———————

INOS, J.:

¶ 1     Appellees Selina Marie Pangelinan and Secundina Untalan Pangelinan ("Appellees") sued Appellant John Sablan Pangelinan ("Appellant" or "John") for tortious interference with contract and abuse of process for his conduct in the probate of the estate of their father and husband, Norberto Eduardo Pangelinan ("Norberto"). John counterclaimed for abuse of process, libel, and quiet title. The trial court dismissed the counterclaims and found for Appellees on all claims. John appeals the dismissal of his quiet title and libel counterclaims, the judgment on the complaint, and other decisions and orders.[1] We AFFIRM the lower court.

## I. OVERVIEW

¶ 2     In the Northern Mariana Islands, only individuals of Northern Marianas descent can hold permanent or long-term interests in real property. NMI CONST. art. XII, § 1. To be of Northern Marianas Descent ("NMD"), a person must have "some degree" of Northern Marianas Chamorro or Northern Marianas Carolinian blood. *Id*. at § 4. To be considered Northern Marianas Chamorro or Northern Marianas Carolinian, a person must have been born or domiciled in the Northern Mariana Islands by 1950 and have been a citizen of the Trust Territory of the Pacific before the termination of the Trusteeship with respect to the Northern Mariana Islands. *Id*. To establish a person's NMD status, there must be a showing that the person has an ancestor who meets the criteria for a Northern Marianas Chamorro or Northern Marianas Carolinian. Though this appeal contemplates several largely unrelated legal issues, the case originates from John's belief that Appellees' ancestor from whom they trace their NMD status does not meet the criteria to be a Northern Marianas Chamorro, disqualifying them from inheriting real property. John contends the real property should go to him.

## II. FACTS AND PROCEDURAL HISTORY

¶ 3     Appellees initiated the probate of Norberto's estate in 2015, seeking approval for the lease of the estate's properties to a developer for 55 years for $3.2 million, sale of the fee simple interest, and distribution of the proceeds.[2] John filed a claim in the probate case for all the estate's real property, asserting that Appellees are not NMD and cannot hold permanent or long-term interests in real property under Article XII of the NMI Constitution. John asserted that Norberto was not NMD and did not hold a valid fee simple title to the lands in his estate, which had passed to him in 1989 from the probate of Norberto's grandfather—Jose Wilson Pangelinan's ("JWP")—estate. John argued JWP was not a full-blooded Chamorro ancestor and his descendants cannot trace their NMD status from him. Relying on 8 CMC § 2411, John contended he should

---

[1]     John does not appeal the dismissal of his abuse of process claim.

[2]     John appeals the trial court's orders and judgments in Civil Action No. 17-0067, but among the court's orders is the application of issue preclusion from orders entered in the probate case, Civil Action No. 15-0169.

receive the remaining interest as the next closest heir because Norberto only held a 55-year interest in the real properties.[3]

¶ 4     JWP was born in Guam in 1874 and lived in Saipan from 1914 until his death in 1952. Among his children were Candido S. Pangelinan ("Candido") and Juan S.N. Pangelinan ("Juan"). Juan was John's father. Candido was Norberto's father—Norberto and John are first cousins. Appellee Secundina Untalan Pangelinan ("Secundina") was Norberto's wife and Appellee Selina Maria Pangelinan ("Selina") is their daughter. John is JWP's grandson, and Selina is JWP's great-granddaughter.

¶ 5     Probate of JWP's estate occurred in 1989. Juan, Candido, the other five living children of JWP, and the children of their one deceased brother executed a distribution agreement dividing the estate among themselves and other descendants of JWP. *In the Matter of the Estate of Jose W. Pangelinan*, Civ. No. 89-1085 (NMI Super. Ct. May 17, 1990) (Decree of Partial Final Distribution at 4). John was not a signatory, but filed a claim and received land through the distribution agreement, which the court approved. Norberto also received properties under the distribution agreement.

¶ 6     In the probate of Norberto's estate, John tried to convince Appellees to settle his claim by accepting that Norberto was a non-NMD and agreeing to distribute the estate properties by either: (1) Secundina taking a life estate and the reversionary interest vesting in John or (2) Selina taking the remaining 28 years of the 55 years from the date that Norberto was deeded the properties from his father with the reversionary interest vesting in John.

¶ 7     Following an evidentiary hearing, in September 2016 the court concluded that Norberto was NMD, tracing his status to his grandfather JWP who was a full-blooded Northern Marianas Chamorro and denied John's claim. An order denying rehearing issued three months later in December 2016 determined John was not an heir and lacked standing to continue as a party. On the same day, the court entered a final decree distributing the properties and approving the lease and sale of the properties and the distribution of the proceeds to Appellees.

¶ 8     John appealed the probate case. In that appeal, we affirmed that he was not an heir and lacked standing to continue in the probate proceeding once the court had decided the issue of Norberto's NMD status because, to have standing in the probate context, "an appellant must demonstrate an interest, even a speculative one, that could be affected by the outcome of the case." *In re Estate of Pangelinan*, 2020 MP 19 ¶ 9 (internal citation omitted). Because John was not

---

[3]   8 CMC § 2411 states:

> Whenever a person not of Northern Marianas descent takes title to real property under this code, he or she shall take the maximum allowable legal interest in the real property and the remaining interest if any shall vest in the next closest heirs or devisees who can legally take title to the real property pursuant to N.M.I. Const. art. XII.

Norberto's heir under his theory of the case, we affirmed that he was a non-heir without standing and did not address JWP's full-blooded ancestor status. *Id*. at ¶ 1, 11.

¶ 9      While the appeal in the probate case was pending, Appellees sued John in a separate action alleging his conduct during the probate proceedings constituted abuse of process and tortious inference with contract. John moved to dismiss, which the court denied. He then answered and counterclaimed for abuse of process, libel, and quiet title, later amending the counterclaim. Appellees missed the deadline to answer or move to dismiss the counterclaim by three days because they calendared the deadline based on the date of the amended counterclaim, rather than the original counterclaim. Default was entered and John moved for entry of default judgment.

¶ 10     The court first denied the motion for default judgment on the belief that the clerk of court had not entered a default on the record. After stipulating that the clerk of court had entered a default against them, the Appellees moved to set aside the entry of default, which the court granted. The court also granted Appellees' motion to dismiss, holding that the quiet title claim was precluded, that the abuse of process claim was not ripe for adjudication, and that court filings cannot form the basis for a libel claim. John then moved for partial summary judgment, which the court denied.

¶ 11     At the conclusion of the bench trial, John moved for judgment as a matter of law, and to dismiss the complaint for failure to state a claim upon which relief can be granted. The court denied both motions.

¶ 12     The court found John liable for abuse of process and tortious interference with contract. Having bifurcated the liability and damages portions of the trial, the court ordered Appellees to submit their request for damages. The court later found John liable for $52,756.49 in damages. He appeals.

### III. JURISDICTION

¶ 13     We have appellate jurisdiction over final judgments and orders of the Commonwealth Superior Court. NMI CONST. art IV, § 3.

### IV. DISCUSSION

¶ 14     John characterizes his appeal as consisting of four parts: (1) the dismissal of his amended counterclaims for quiet title and libel in Civil Action No. 17-0067;[4] (2) arguments contesting JWP's and Norberto's statuses; (3) an appeal of a list of orders and the judgment in Civil Action No. 17-0067; and (4) allegations of bias by the trial court. Appellant's Br. at 5. We begin by reviewing application of the doctrine of issue preclusion to the quiet title counterclaim.

---

4      John voluntarily dropped his counterclaim for abuse of process. Appellant's Br. at 5.

*A. The court properly dismissed the quiet title counterclaim*
*under the doctrine of issue preclusion.*

¶ 15 The counterclaim purports to be an action to quiet title to the real property in Norberto's estate. App. B at 5–10. The sole argument in the counterclaim is a repetition of John's argument contesting the statuses of JWP and Norberto in the probate proceeding. The trial court ruled that because the probate court already finally decided the statuses of JWP and Norberto, John was precluded from relitigating the same issue, and dismissed the counterclaim.[5] *See* App. F at 1–13, (*Pangelinan v. Pangelinan*, Civ. No. 17-0067 (NMI Super. Ct. April 5, 2018) (Order Dismissing Defendant's Counterclaims of Quiet Title as Barred by Res Judicata) (citing *In re Estate of Norberto Eduardo Pangelinan*, Civ. No. 15-0169 (NMI Super. Ct. Sept. 20, 2016) (Order Denying Motion, Claim and Petition of John S. Pangelinan, and Granting Estate's Motion to Dismiss Demands of John S. Pangelinan))). He appeals this determination. Whether the trial court properly applied the doctrine of issue preclusion is a question of law we review de novo. *Lizama v. ANZ Guam, Inc.*, 2020 MP 17 ¶ 8.

¶ 16 Issue preclusion refers to "the effect of a judgment in foreclosing relitigation of a matter that has been already litigated and decided." *Id* at ¶ 10. For an issue to be precluded, it must be: (1) identical to the one raised in the pending action; (2) actually litigated; (3) necessarily decided; (4) final and on the merits; and (5) the party against whom preclusion is sought must be the same as, or in privity with, the party to the former proceeding. *Id*.

*i. The issue in the quiet title counterclaim is identical*
*to the issue decided in the probate case.*

¶ 17 When two issues adjudicated in separate actions are "materially the same" those issues are identical for purposes of issue preclusion. *Lizama*, 2020 MP 17 ¶ 11. When allegations are "nearly verbatim," they satisfy the first element of issue preclusion. *Id*. Though the counterclaim purports to "quiet title" to the real property held in Norberto's Estate, in reality, the only legal question raised in the counterclaim is the status of JWP and Norberto under Article XII of the NMI Constitution. App. B at 5.

¶ 18 Norberto's NMD status was directly before the court during the probate of Norberto's estate—because John raised it—and was decided in that proceeding. In its September 2016 order, the court stated: "although phrased many ways, the issue before the Court [is] whether the Decedent, Norberto Eduardo Pangelinan, was a person of Northern Marianas decent, such that the Estate can hold real property under Article XII of the Constitution of the Northern Mariana Islands,

---

[5] The trial court has used the term res judicata to refer to the doctrine applied to preclude the relitigation of the statuses of JWP and Norberto. For clarity, we use the term issue preclusion, also known as collateral estoppel, *Lizama v. ANZ Guam, Inc.*, 2020 MP 17 ¶ 10, to distinguish from the concept of claim preclusion which is often used interchangeably with the term res judicata. *See In re Estate of Camacho*, 4 NMI 22, 25 (1993).

and such that Decedent's child can inherit it." *In re Estate of Pangelinan*, No. 15-0169-CV at 2 (NMI Super. Ct. Sep. 20, 2016) (Order Denying Motion, Claim and Petition of John S. Pangelinan, and Granting Estate's Motion to Dismiss Demands of John S. Pangelinan) ("September 2016 Order").[6] Deciding the issue in the affirmative, the court held that "[a]ccordingly, [John] . . . has no claim to the Estate's property." *Id.* The issue decided by the probate court in September 2016 is identical to the legal issue forming the basis of the quiet title counterclaim. *See* App. B, at 6.

### ii. The issue was actually litigated and necessarily decided.

¶ 19     The second and third elements, whether the issue was actually litigated and necessarily decided, are "interrelated," and often analyzed together. *Cook v. Harding*, 879 F.3d 1035, 1042 (9th Cir. 2018). As a conceptual matter, if an issue was necessarily decided in a prior proceeding, it was actually litigated, though the converse proposition is not true. *Harmon v. Kobrin (In re Harmon)*, 250 F.3d 1240, 1248, 1248 n.9 (9th Cir. 2001).

¶ 20     An issue is necessarily decided when it is not "entirely unnecessary to the judgment in the initial proceeding." *Lizama*, 2020 MP 17 at ¶ 13. Not every probate proceeding requires a determination of a decedent's NMD status, however when an estate holds land subject to the alienation restrictions in Article XII of the NMI Constitution, a determination of the decedent's NMD status is not entirely unnecessary to the judgment. This is particularly true in this case, where the validity of the estate's holdings had been directly challenged on the basis that the decedent was not of Northern Marianas descent.

¶ 21     A determination of Norberto's NMD status was necessary to the judgment because John's claimed interest relies on a challenge to the validity of Norberto's ancestry and ability to hold a permanent interest in land under Article XII. The finding that Norberto was NMD and Selina was an heir was necessary to dispose of John's motion, claim, and petition so the court could issue a final decree of distribution. The issue was necessarily decided.

¶ 22     An issue is actually litigated when it has been "raised, contested, and submitted for determination in the prior proceeding." *Lizama*, 2020 MP 17 at ¶ 12 (internal quotations omitted). The court held an evidentiary hearing on the NMD status issue. John was present and represented himself. September 2016 Order at 1. The court then ruled: "[t]he Court finds that the Decedent, Norberto Eduardo Pangelinan[,] was a person of Northern Marianas descent tracing back to his paternal grandfather, Jose Wilson Pangelinan, the same full-blooded Chamorro ancestor from whom the Estate's land derives." *Id.* at 2. John acknowledged to this Court that this issue "was fully briefed . . . in the probate case *In re the Estate of Norberto Eduardo Pangelinan,*" asserting that to reargue the issue again would be "redundant and unnecessary." *Pangelinan v. Pangelinan*, No. 2020-SCC-0005-CIV (NMI Sup. Ct. Jan. 12, 2021) (Proposed

---

[6]     As a part of determining Norberto's NMD status, the probate court necessarily determined JWP's status. September 2016 Order at 10-11.

Memorandum Decision on Jose Wilson Pangelinan at 1). We agree that the issue was actually litigated.

*iii. The decision was final and on the merits.*

¶ 23    A decision is final for issue preclusion when it is "firm and stable," and "the last word of the rendering court." *Taman v. Marianas Pub. Land Corp.*, 4 NMI 287, 292 (1995). Factors that support a decision being final for issue preclusion include: (1) whether the parties were fully heard; (2) whether the court "supported its decision with a reasoned opinion;" and (3) whether the decision was subject to appeal or was in fact reviewed on appeal. *Commonwealth v. Cabrera*, 1999 MP 22 ¶ 13. The probate court's decision followed John's motion and a hearing on the merits at which both parties were present. The written order adopted wholesale the reasoning of the Estate's proposed findings and appended about forty pages of discussion by Norberto's Estate on the matter. *See generally*, September 2016 Order. The decision was subject to appeal, and John appealed the decision to this Court, though we disposed of the appeal on the basis that he lacked standing. *See In re Estate of Pangelinan*, 2020 MP 19 ¶¶ 5, 11. The finding that Norberto was a person of Northern Marianas descent, that Selina as his heir may inherit the property, and that Appellant has no claim to the property of Norberto's estate was a firm and stable decision and the court's final word on the matter. *See* September 2016 Order at 1–2. The probate court's decision was final and on the merits for preclusion purposes.

*iv. Appellant was not a party to the proceedings for the purpose of issue preclusion because he could not appeal the court's decision.*

¶ 24    The final element is that the party against whom issue preclusion is sought must be the same as, or in privity with, the party to the former proceeding. *Lizama v. ANZ Guam, Inc.*, 2020 MP 17 ¶ 10. This is to ensure that the interests of the party to be estopped were adequately represented in the former proceedings. *See People v. Sims*, 651 P.2d 321, 333 (1982). In most circumstances, a prior determination by a court only has a preclusive effect against the same parties, and issue preclusion cannot be wielded as a sword against non-parties.

¶ 25    John participated in the probate proceedings that resulted in a status determination, but whether he was a party to the proceedings to satisfy issue preclusion is a more complex matter.

¶ 26    The court correctly found that John lacked standing to participate in the probate proceedings, but because this came after he had actively participated for months, we must examine whether he can fairly be considered a party to the proceedings for the purpose of issue preclusion. John litigated the issue and received a final determination on the merits. That said, the standing determination affected John's ability to appeal the status determination of JWP and Norberto.

¶ 27    As a general rule, "relitigation of [an] issue in a subsequent action between the parties is not precluded . . . [when] the party against whom preclusion is sought could not, as a matter of law, have obtained review of the judgment in the

initial action." Restatement (Second) of Judgments § 28 (1982). Whether review of the judgment was available as a matter of law in a situation such as this is described in the comments to the Restatement:

> If the judgment of the court of first instance was based on a determination of two issues, either of which standing independently would be sufficient to support the result, and … the appellate court upholds one of these determinations as sufficient and refuses to consider whether or not the other is sufficient and accordingly affirms the judgment, the judgment is conclusive as to the first determination.
>
> *Id.* at § 27 cmt. o. *See also id.* at § 28 cmt. a. ("if there was an alternative determination adequate to support the judgment, the rule of [issue preclusion] does not apply.")

Here, appeal of the probate court's status determination of JWP and Norberto under Article XII was unavailable to John as a matter of law because, after it denied rehearing on the status determination, the probate court held that he lacked standing to continue. When we affirmed the probate court on standing, we did not reach the issue of the status determination and appeal was unavailable to John as a matter of law, therefore he cannot be considered a party to the proceedings under an ordinary issue preclusion analysis.

### v. The September 2016 Order is a judgment determining status precluding future relitigation of the issue.

¶ 28 That John cannot be considered a party to the proceedings would typically bar the application of issue preclusion, but certain judgments determining status are afforded a preclusive effect against non-parties. Under the Restatement:

> A judgment in an action whose purpose is to determine or change a person's status is conclusive with respect to that status upon all other persons, with the following [relevant] qualifications:
>
> (a)      If a person has, under applicable law, an interest in such status such that he is entitled to contest its existence, the judgment is not conclusive upon him unless he was afforded an opportunity to be a party to the action;
>
> (b)      . . .
>
> (c)      As against a person who is not entitled to contest the existence of the status, the judgment is not accorded effect to the extent it would result in unjust effect on that person's own status, rights, or obligations.
>
> Restatement (Second) of Judgments § 31(2) (1982).

First, we ask whether the September 2016 Order is a judgment in an action to determine or change a status. Second, we ask whether John had an interest in the NMD status determination of JWP and Norberto that would entitle him to contest its existence. Finally, we ask whether giving effect to the September 2016 order would result in an unjust effect on John's status, rights, or obligations.

*1. The September 2016 Order is a judgment determining status.*

¶ 29    Under the Restatement, the scope of issue preclusion for judgments determining status includes "various forms of continuing legal relations between an individual and society as a whole, such as citizenship, . . . includ[ing] legal relations of indefinite term." *Id.* at cmt. a. Proceedings for determination of status are characterized by the state asserting an interest of its own in the determination, and often include an independent investigation of the facts and applicable legal standards by the court, as well as party presentations on the issue. *Id.* The proceedings that warrant an application of issue preclusion against non-parties are those for determining statuses in which "[t]he state has a supervisory interest in the personal and social relationships associated with [that] status, and with the proper allocation of rights and obligations concerning property and support that attend those relationships." *Id.* at cmt. b. Though issue preclusion based on a judgment determining status is usually only applied in proceedings conducted with the sole or principal purpose of determining status, the reasoning for application of issue preclusion for status determinations is to establish a "firm legal premise in all matters in which the status may subsequently be significant." *Id.* In such proceedings, the court acts not only as arbiter between the parties to the proceedings, but also as a "monitor" on behalf of a public interest. *Id.*

¶ 30    Courts applying the common law must balance the sometimes-conflicting policies that an issue fairly tried should not be retried and the policy that status should not be conclusively determined except in the special proceedings prescribed for that purpose. *Id.* Probate proceedings are not always conducted for the sole or principal purpose of determining status, nor can they be considered special proceedings prescribed for determining status. Not all decisions made during probate proceedings are judgments determining status, and not all will have a preclusive effect on future legal proceedings: only those decisions by a probate court that result from proceedings "conducted with the sole or principal purpose of determining status and with a view to making a determination that can be taken as a firm legal premise in all matters in which the status may subsequently be significant." *Id.* The September 2016 Order resulted from an evidentiary hearing conducted for the specific purpose of making a final determination of the Article XII status of JWP and Norberto.

¶ 31    NMD status is the type of status that warrants a conclusive determination against all other persons. Article XII of the NMI Constitution restricts acquisition of permanent and long-term interests in real property to persons of Northern Marianas descent in recognition of "the importance of the ownership of land for the culture and tradition of the people of the Northern Mariana Islands . . . in order to protect them against exploitation and to promote their economic advancement and self-sufficiency." Commission Comment, NMI CONST. art. XII, § 4. The drafters of Article XII intended to promote finality in NMD status determinations by the Superior Court:

> [I]f the court, based on such evidence finds and agrees that the
> person in fact possess [sic] at least some degree of blood quantum

of Northern Marianas Chamorro or Northern Marianas Carolinian blood or a combination thereof, that said person shall be qualified and considered a person of Northern Marianas descent.
*Id*.

We hold that the September 2016 order finding JWP is Norberto's full-blooded Chamorro ancestor and that Norberto is of Northern Marianas descent is a judgment determining status.

### 2. Appellant is not entitled to contest the status determination of JWP and Norberto.

¶ 32    Generally, a status determination binds non-parties when it effects a transformation of the legal status of the person involved which others have no legal authority to challenge. Restatement (Second) of Judgments § 31 cmt. f (1982). There is no specific constitutional, statutory or regulatory right for a third party to challenge a person's NMD status.[7] The Restatement's reference to "authority to challenge" contemplates circumstances when the rules require notice to, or joinder of, necessary parties. *Id.* The thrust of this inquiry is to allow individuals with a concrete interest at stake in the title determination, and not "remote strangers," to challenge a status determination. *Id.*[8] Because there is no explicit right for third parties to contest NMD status determinations, John could only contest the status determination if he has more than a remote interest that may be affected by the status determination, which he lacks.

¶ 33    John describes an attenuated path to his interest in Appellees' land:

> In this case, assuming (as assumed elsewhere) that Norberto's non-NMD mother survived his father Candido, her taking a life estate took also the title (evidence of ownership, freeholders own the land during the duration of their indeterminable estate— that is, the *title*) and that upon her death (presumed above) her title extinguished and the remainderman's (Juan) estate in fee simple became absolute— thus, the fee simple absolute estate merged in Juan, the "next closest heir" under this 8 CMC §2411, and upon Juan's death the title was casted upon Juan's son, Appellant-Pangelinan.
> Appellant's Br. at 10.

---

[7]    While the NMI Constitution requires an evidentiary hearing for NMD status determination by the Superior Court, the law is silent on whether any third party has a right to notice and opportunity to be heard in such a hearing. NMI CONST. art. XII, § 4.

[8]    The term "remote stranger" does not refer to the relative distance of a party's familial relationship to the person whose status is in question. Rather it refers to the relative distance of the party's claimed interest to any concrete legal claim beyond a hypothetical interest that could only exist if the status determination did not exist. The Restatement defines "remote strangers" as the opposite of those persons "whose own status and welfare are intimately bound in the relationship." Restatement (Second) of Judgments § 31 cmt. f (1982).

This ownership theory stacks assumptions upon presumptions, yet John fails to describe how a finding that JWP and Norberto are disqualified from acquiring land under Article XII entitles him to absolute ownership of the land above all others. To understand that, we look at the counterclaim to quiet title:

> Defendant Pangelinan, as the sole claimant in *Re Estate of Norberto E. Pangelinan*, Civil Action No. 15-0169, CNMI Superior Court, is entitled to inherit alone all of the above-described "ancestors' lands", he inherited them and is entitled that the title to said lands be quieted in him and his heirs.
> App. B at 10.

¶ 34 Beyond stating that as the "sole claimant," he is entitled to inherit all land, John has provided no basis for his claim that he alone is entitled to inherit Appellees' land rather than any other NMD descendants of JWP, Candido, Juan, or Norberto.[9] Though John does not explain what he means by the term "sole claimant," the existence of other possible heirs makes it apparent that John believes he should inherit all because he is the only one among those potential heirs who has made a claim for the land. September 2016 Order at 16. In essence, John asks the court to adjudicate the interests of possibly countless unknown individuals who could stand to inherit under his theory without affording them notice or opportunity to be heard. Considering the only obstacle to affirming the application of issue preclusion is whether John had a right to be fully present as a party to the NMD status determination, we could not grant the relief he requests.

¶ 35 John has no interest intimately bound in the determination of JWP and Norberto's statuses. Any possible legal claim to inheritance of the land that John may have is speculative and likely differs little from the speculative claims that other descendants of JWP, Candido, or Juan could have. Pursuing this thread, any determination of NMD status would implicate the interest of remote strangers. However, the Commonwealth has an interest in firm and final decisions on NMD status and Article XII so that the lands in the Commonwealth do not indefinitely languish in probate limbo. To require notice and opportunity to be heard for untold numbers of remote strangers at any hearing to determine NMD status would undermine the Commonwealth's interest and cast doubt on practically all other NMD status determinations that the courts have made—a result that this Court will not help bring about.

### 3. According the probate court's status determination full effect will not result in an unjust effect upon John's status, rights, or obligations.

¶ 36 Even if a party's claimed interest in a status determination does not establish an independent right to be present at a status determination proceeding, we will still not apply preclusion against a non-party who can demonstrate that some other collateral status, right, or obligation of theirs would be unjustly affected. Restatement (Second) of Judgments § 31(2)(c) (1982). Here, neither the

---

[9] Besides Candido and Juan, JWP had six other children, and at least thirteen grandchildren other than John and Norberto. *See* September 2016 Order at 18.

quiet title action nor the appellate briefs raise any status, right, or obligation related to the status determination other than the speculative interest that could arise if the status determination were overturned. An action to quiet title "lies against those who, at the time it is instituted, are the present claimants to the land *under the instrument which creates the cloud*,"[10] and we have held that a probate court's final decree of distribution does not have a preclusive effect upon a third party bringing an action to quiet title under a separate instrument. *Piteg v. Piteg*, 2000 MP 3 ¶¶ 12–13 (finding that a probate court's decree of final distribution did not bar a claimant's action to quiet title when the basis for that action was a deed of gift that had been entered into by the decedent's heirs after she had died). John did not base his quiet title action on an instrument clouding title to the property or any other source by which he could claim title. He has referenced no other status, right, or obligation that could be unjustly affected by the probate court's judgment determining Norberto's status. The only status, rights, or obligations John has argued would be affected are based in his theory regarding the statuses of JWP and Norberto. Nothing that has been presented gives us any reason to doubt the fairness of affirming the court's status determination and subsequent application of issue preclusion.

¶ 37    Because all other elements of the issue preclusion analysis are met, and because judgments determining status are conclusive as to all other persons, making John's presence at the status determination unnecessary, the court did not err in dismissing the counterclaim to quiet title. The probate court's order was based on findings that Jose Wilson Pangelinan was a full-blooded ancestor. Thus, John may not relitigate the issue of the Article XII statuses of JWP and Norberto. Similarly, we do not reach the challenge to the court's denial of his motion for partial summary judgment. John's motion for partial summary judgment is similarly moot because it depended on the precluded argument that Appellees lack standing because they are not of Northern Marianas descent.

¶ 38    Similarly, we do not reach the appeal of the denial of his NMI Rule of Civil Procedure 52(c) motion for judgment as a matter of law because it relies on the same arguments barred by issue preclusion and is also moot. Appellant's Brief at 31–32.

### B. The counterclaim for libel was properly dismissed.

¶ 39    John's libel counterclaim alleges that Appellees falsely accused him of abuse of process, called him a vexatious litigant, and caused defamatory statements to be published in the newspaper. App. B at 14.

¶ 40    The court dismissed the counterclaim under NMI Rule of Civil Procedure 12(b)(6) for failure to state a claim on which relief can be granted, finding that Appellees had immunity for statements their attorney made arising out of judicial proceedings. We review dismissals under Rule 12(b)(6) de novo. *Claassens v. CHCC*, 2021 MP 9 ¶ 15. "When reviewing a Rule 12(b)(6) motion, a court must

---

[10]    *In re the Estate of Manglona*, 2023 MP 13 ¶ 28 (quoting *Fusco v. Matsumoto*, 2011 MP 17 ¶ 21) (emphasis added).

determine if the non-moving party fails to assert a claim upon which relief can be granted." *Id*. ¶ 16 (internal quotations omitted). Rule 12(b)(6) weeds out cases in which a plaintiff could never win based on the factual allegations in the complaint. *Id*. We "construe the complaint in the light most favorable to the plaintiff and take its allegations to be true for purposes of a motion to dismiss." *Id*. (internal quotations omitted).

¶ 41    John made three allegations: (1) Appellees falsely accused him of abuse of process in their complaint; (2) Appellees "badmouthed" him by claiming he was a vexatious litigant in their complaint and during the probate of Norberto's estate; and (3) Appellees statements led to the publication of two false articles about him in the newspaper. App. B at 15.

¶ 42    Construing the first two allegations in John's favor and assuming as true that: (1) Appellees' abuse of process claim was meritless; and (2) Appellees referred to John as a vexatious litigant in their complaint and during the probate of Norberto's estate, dismissal is appropriate. The counterclaim fails to allege a basis upon which relief can be granted. A claim to the court during a legal proceeding that a litigant has abused process or is a vexatious litigant is a legitimate claim, and without further alleged facts, cannot form the basis for a libel countersuit. *See*, *e.g.*, 7 CMC § 2204 (recognizing abuse of process as a valid cause of action against a private party); 7 CMC §§ 2451–57 (providing a defendant a right to move the court to declare a party a vexatious litigant).

¶ 43    On the third allegation, the court found that the plaintiffs had an absolute defense to publish defamatory material under Section 586 of the Restatement (Second) of Torts. App. F at 12. The Restatement states:

> An attorney at law is absolutely privileged to publish defamatory matter concerning another in communications preliminary to a proposed judicial proceeding, or in the institution of, or during the course and as a part of, a judicial proceeding in which he participates as counsel, if it has some relation to the proceeding. Restatement (Second) of Torts § 586 (1965).

¶ 44    The Commonwealth code provides that "the restatements of the law . . . shall be the rules of decision in the courts of the Commonwealth, in the absence of written law or local customary law to the contrary." 7 CMC § 3401. We have not adopted the Second Restatement of Torts' defamation standards wholesale; instead, we utilize a "section by section approach." *Tan v. Younis Art. Studio, Inc.*, 2007 MP 11 ¶ 24. "[F]inding the controlling defamation law" requires courts to:

> first look to local written law, which includes our case law adopting and/or adapting Restatement provisions. To the extent local written law is lacking, the Restatement fills the gaps. However, since this process of amalgamating local law and Restatement principles increases the potential for intrusion into protected First Amendment areas, special care must be taken when

adopting new law. Any modifications must be consistent with
*New York Times*[11] and its progeny.
*Id.* at ¶ 31.

¶ 45    Following the approach in *Tan*, we observe no controlling constitutional provisions, statutes, or case law on this question. The Restatement section here favors free speech and aligns with United States Supreme Court cases. *See Sahara Gaming Corp. v. Culinary Workers Union Loc. 226*, 984 P.2d 164, 166–68 (Nev. 1999) ("The policy underlying the privilege is that in certain situations the public interest in having people speak freely outweighs the risk that individuals will occasionally abuse the privilege by making false and malicious statements.") (internal quotation and citation omitted). With no controlling local law, the court properly applied section 586 of the Restatement.

¶ 46    Appellees' attorney was privileged to make the statements in question, and a suit for libel cannot stand based on those communications. The counterclaim failed to state a claim on which relief could be granted, and was properly dismissed.

*C. The trial court did not err in setting aside entry of default.*

¶ 47    John moved to dismiss Appellees' complaint for failure to state a claim upon which a relief may be granted. When the court denied the motion, he answered the complaint and counterclaimed. He amended and served the answer and counterclaim seven days later. The day after the answer was due under Commonwealth Rule of Civil Procedure 15(a),[12] the clerk of court entered a default against Secundina and Selina. John immediately moved for a default judgment on the same day.

¶ 48    Appellees moved to dismiss the counterclaims four days late on August 18, 2017. Appellees claimed they had incorrectly calendared the due date 20 days after service of the amended answer and counterclaim, instead of 20 days after service of the original answer and counterclaim.

¶ 49    The court set aside the entry of default under the factors we laid out in *In re the Matter of Woodruff*, 2015 MP 11: "(1) whether the party seeking to set aside default engaged in culpable conduct that led to the default; (2) whether it had no meritorious defense; or (3) whether reopening the default judgment would prejudice the other party." *Id*. at ¶ 21. We review orders setting aside an entry of default for abuse of discretion. *Id*. at ¶ 8. Under this standard:

> [t]o determine that there has been an abuse of discretion, . . . the record must be devoid of competent evidence to support the

---

[11]    *New York Times Co. v. Sullivan*, 376 U.S. 254 (1964), is the foundational case from the U.S. Supreme Court surrounding free speech protections in the context of defamation lawsuits.

[12]    Because this case began before our current rules of civil procedure took effect, the older version applies. NMI R. Civ. P. 1(b).

> decision of the trial court. Further, in testing the sufficiency of the evidence it must be taken in the strongest manner in favor of the appellee and in support of the court's findings, and a judgment will not be disturbed when there is any reasonable evidence to support it.
>
> *Robinson v. Robinson*, 1 NMI 81, 89 (1990) (internal quotations omitted).

We review the court's application of the *Woodruff* factors to the circumstances surrounding the entry of default to determine if there is "any reasonable evidence" to support the court's decision. *Id*.

¶ 50　Under factor one, a court must consider whether the default was caused by Appellees' culpable conduct. "A party's conduct is culpable when he has received actual or constructive notice of the filing of the action and intentionally failed to answer." *Woodruff*, 2015 MP 11 ¶ 22 (internal quotation and citation omitted). An intentional failure to answer is:

> akin to an act of bad faith[.] . . . Neglectful failure to answer as to which the defendant offers a credible, good faith explanation negating any intention to take advantage of the opposing party, interfere with judicial decisionmaking, or otherwise manipulate the legal process is not "intentional" . . . and is therefore not *necessarily*—although it certainly may be, once the equitable factors are considered—culpable or inexcusable.
>
> *Id*. (internal quotation and citation omitted).

¶ 51　Here, the court found that because John filed his counterclaim and amended counterclaim close in time with one another, the mistaken late filing was not willful, deliberate, or an act of bad faith and therefore not culpable conduct warranting a default. App. H at 6 (*Pangelinan v. Pangelinan*, No. 17-0067-CV (NMI Super. Ct. Feb. 1, 2019) (Order Granting Motion to Set Aside Entry of Default)).

¶ 52　Under factor two, a court must consider whether the party seeking to set aside default has a meritorious defense. "A defendant seeking to vacate a default judgment must present specific facts that would constitute a defense. . . . The defendant need only allege sufficient facts that, if true, would constitute a defense." *In re the Matter of Woodruff*, 2015 MP 11 ¶ 25 (internal quotations and citations omitted). The court found that Appellees had raised absolute immunity for the libel counterclaim and res judicata for the quiet title counterclaim as their meritorious defenses. App. H at 6 (Order Granting Motion to Set Aside Entry of Default).

¶ 53　Under factor three, a court must consider whether John would suffer any prejudice.

> To show prejudice to the non-defaulting party, the setting aside of a judgment must result in greater harm than simply delaying

> resolution of the case. Rather, establishing prejudice requires a showing that setting aside default will hinder the plaintiff's ability to pursue the claim. . . . On the other hand, requiring a plaintiff to litigate the merits of a case does not, by itself, constitute prejudice.
>
> *In re the Matter of Woodruff*, 2015 MP 11 ¶ 28 (internal quotation and citation omitted).

The trial court found "[t]he four-day delay in the filing of any answer is de minimus [sic]" and would not prevent John from pursuing his counterclaims, leading it to find no prejudice. App. H at 7 (Order Granting Motion to Set Aside Entry of Default).

¶ 54     John argues that he was "greatly prejudiced" by the "fraudulent[]" procurement of the dismissal of his quiet title claim. Appellant's Br. at 18. He argues he would be entitled to default judgment had the court accepted all the factual allegations in the amended counterclaim as true. *Id*. This argument misunderstands and conflates different tests. Default occurs "[w]hen a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend[.]" COM. R. CIV. P. 55(a). When default occurs, default judgment will be entered, unless the defaulting party shows good cause for setting aside the entry of default or the default judgment. *Id*. at R. 55(c). The three-factor *Woodruff* test establishes whether good cause exists to set aside default. 2015 MP 11 at ¶¶ 20–21. Default judgment is appropriate when a party fails to plead or defend without good cause shown. Under no circumstance would the court's acceptance of the allegations in the counterclaim as true (which is the standard for considering a motion to dismiss for failure to state a claim upon which relief can be granted) entitle a party to default judgment—or any judgment for that matter. The result from a court accepting as true the allegations in a claim is that the claim will either survive or not survive dismissal; the question of default is unrelated.

¶ 55     John further argues that "setting aside the entry of default *without* setting aside the order of April 5, 2018 dismissing Appellant-Pangelinan's amended counterclaim, the order which was conditioned-precedent that no entry of default was made by Appellant-Pangelinan, is very prejudicial to him as that hindered his ability to pursue his claim." Appellant's Br. at 18–19. John elaborates no further on this point, but we will infer for his argument that he attempts to say that the court's mistaken belief on April 5, 2018 that the Clerk of Court had not yet entered Appellees' default somehow affected the court's order dismissing John's amended counterclaims, which was issued on the same day. This argument misses the point. When considering setting aside an entry of default, the thrust of the prejudice inquiry is aimed at whether disregarding the defaulting party's delay will somehow prejudice the non-defaulting party by hindering their ability to pursue the claim. 2015 MP 11 ¶ 28. Because this inquiry asks about the prejudicial effect that one party's delay has on the non-defaulting party, it is unrelated to the court's decision-making in other matters. The court's misapprehension about whether Appellee's default had been entered, which it

corrected, is unrelated to the prejudicial effect that Appellees' default could have had on John's pursuit of his counterclaims.

¶ 56    John's concern that the court's incorrect belief regarding the status of entry of default on April 5, 2018 influenced its reasoning when it dismissed the counterclaims on the same day is unrelated to whether the court abused its discretion in setting aside the entry of default. Moreover, our review of the dismissal of the counterclaims for libel and quiet title is de novo, meaning we afford the lower court's dismissal no deference. *See United States v. George*, 971 F.2d 1113, 1118 (4th Cir. 1992) ("By definition, *de novo* review entails consideration of an issue as if it had not been decided previously."); and *supra* at ¶¶ 15, 40 (applying de novo review to the dismissal of the counterclaims for quiet title and libel).

¶ 57    Because the court based its decision to set aside the entry of default on competent evidence that reasonably satisfies all three *Woodruff* factors, it did not abuse its discretion.

### D. The court did not clearly err in finding abuse of process.

¶ 58    After a bench trial, the court held John liable for abuse of process for his conduct during the probate of Norberto's estate. The order and judgment contains factual findings and application of law, which we review for clear error. *Commonwealth v. Kaipat*, 2022 MP 9 ¶ 14. Review for clear error involves a high level of deference for the trial court's factual findings,[13] because the trial court is in the best position to assess evidence and make factual determinations. *Islam v. Ayuyu*, 2009 MP 17 ¶ 17 (stating that the trier of fact has the exclusive function of determining the credibility of witnesses, resolving evidentiary conflicts, and drawing reasonable inference from proven facts.). We will not find clear error unless "after reviewing all the evidence we are left with a firm and definite conviction that a mistake has been made." *Commonwealth v. Crisostomo*, 2014 MP 18 ¶ 8. The central question in our review for clear error is whether "the court could rationally have found as it did, rather than whether we would have ruled differently." *In re Abraczinskas*, 2023 MP 12 ¶ 11 (quoting *Commonwealth v. Taitano*, 2017 MP 19 ¶ 44). We review de novo the court's application of the law to its factual findings. *White v. Camacho*, 2022 MP 4 ¶ 6.

¶ 59    In its order and judgment, the court found the testimony of both Secundina and Selena credible. By contrast, John's testimony was found not credible because his answers to questions "were evasive, circular in reasoning, and a re-hash" of the probate action claims that Norberto and Selina are not NMD–an issue the court had previously ruled on in 2016. App. L at 12–13 (*Pangelinan v. Pangelinan*, No. 17-0067-CV (NMI Super. Ct. May 21, 2020) (Order and Judgment Against Defendant John Sablan Pangelinan for Abuse of Process and Tortious Inference with Contractual Relations)). We defer to a trial court's

---

[13]    *Su Yue Min v. Feng Hua Enter., Inc.*, 2017 MP 3 ¶ 20.

credibility assessment of witnesses and testimony, as it has the best opportunity to observe the demeanor of the witnesses. *Markoff v. Lizama*, 2016 MP 7 ¶ 14.

*i. The court made relevant factual findings and reasonable inferences.*

¶ 60     The court found that John wrote to Appellees' attorney outlining his claim in Norberto's estate and emphasizing the time it could take to resolve the probate, the financial burden this litigation would create for the Appellees in attorney's fees, and the risk that Appellees' plans for sale of the property could fall through as a result of delays. John stated:

> I have also filed the "Petition of John S. Pangelinan for Partial Final Distribution," which might just require [Selina] to file an opposition and assistance of an attorney. Furthermore, ***it might get worse*** because I am prepared to go all the way until all avenues are exhausted if the judge should decide against me. *You are very much aware that judicial matter have a mind of its own and the wheels of justice **turn oh-so very slowly and costly.** . . . The [Appellees] must know that, from a business perspective, if BSI acquires enough land for its needs it might just reneged [sic] on its land-sale contract with the Decedent and demand for the return of the substantial deposit already paid.*
>
> App. L at 7–8 (Order and Judgment) (emphasis in original).

¶ 61     The court found that John's primary purpose in the probate action was to harass Appellees and "cause them to spend excessive legal fees." *Id*. at 18. The court determined that even if he originally intended to obtain land, his "intentions changed" after the Appellees rejected his demands. *Id*. After examining the exhibits and considering the testimonies at trial, the court found that John "became spiteful and used the judicial proceeding as a means to get back at [Appellees]," and his purpose was to harass and financially harm the Appellees by his actions. *Id*.

¶ 62     The trial court found that John was "very familiar with court proceedings and is knowledgeable about how to clog-up the court's docket." *Id*. at 8.

¶ 63     For instance, throughout the proceedings, John "intentionally made himself unavailable to be personally served by [Appellees]." *Id*. Though he would file motions and filings, and serve counsel for the Estate, he refused to sign up for the court's e-filing system or agree to service by email, forcing Appellees to personally serve him with responses and oppositions to his many filings. *Id*.

¶ 64     Moreover, John would "dodge service in a blatant attempt to run out the clock or cause a deadline to expire." *Id*. These tactics continued into the proceedings in CV-17-0067, forcing the trial court to order John to be served via the pro se box at the Clerk of Court. *Id*. at 7–8.

¶ 65     Additionally, John filed over five hundred pages of frivolous motions, declarations, objections, petitions, and claims during the probate action. *Id*. at 10.

¶ 66    The trial court found that during the probate proceedings, John communicated to Appellees that he would keep the $3.2 million dollars from the Peak Development land lease contract in escrow and give Appellees a small amount of the money if they agreed to settle. *Id*. at 14.

¶ 67    The trial court discovered that John told Appellees they should accept his offer before Peak Development tired of waiting and reneged on the lease contract. *Id*.

¶ 68    Reviewing the record, we find that the trial court's findings of fact and reasonable inferences could rationally be drawn from the evidence at the bench trial. John does not argue, nor do we observe, any error that leaves us with a definite and firm conviction that a mistake was made.

   *ii. The court properly applied the law in finding abuse of process.*

¶ 69    Abuse of process occurs when a party "uses a legal process, whether criminal or civil, against another primarily to accomplish a purpose for which it is not designed." Restatement (Second) of Torts § 682 (1977).[14] We disfavor the tort of abuse of process because it is "likely to have a chilling effect on an individual's choice to seek judicial recourse." *Waibel v. Farber*, 2006 MP 15 ¶ 24. However, this action deters overzealous litigants and provides a means of redress for a defendant who was wrongfully dragged through the judicial system. *Id*. We will uphold a judgment for abuse of process when we find it is necessary to provide such deterrence or redress.

¶ 70    The misconduct that constitutes abuse of process is the "misuse of process . . . for any purpose other than that which it was designed to accomplish." Restatement (Second) of Torts § 682 cmt. a. (1977). The requirement that misuse of process be primarily to accomplish a purpose for which it is not designed, means that "there is no action for abuse of process when . . . there is an incidental motive of spite or an ulterior purpose of benefit to the defendant." *Id*. at cmt. b.

¶ 71    Whether a party meets the requisite mental state to satisfy an element of a claim is a question of fact which we review for clear error. *See Fusco v. Matsumoto*, 2011 MP 17 ¶ 13 (holding that determination of donative intent is a question of fact); *Rebuenog v. Aldan*, 2010 MP 1 ¶ 22 (holding that the determination of a resident's intent to return is a question of fact); *Aplus Co. v. Niizeki Int'l Saipan, Co.*, 2006 MP 13 ¶ 18 (holding that whether parties to a contract intended to confer a benefit on a third party is a question of fact). In the case of the tort of abuse of process, whether a certain purpose was a party's primary purpose or merely incidental to the proceedings is also a question of fact. *See Young v. Allstate Ins. Co.*, 198 P.3d 666, 677 (Haw. 2008) (holding that an abuse of process defendant's "primary motivation constitutes a question of fact that cannot be resolved by way of a[] . . . Rule 12(b)(6) motion to dismiss.") Based on the evidence and testimony at trial, the court found that John's

---

[14]    In the absence of written law or local customary law on the tort of abuse of process, we look to the common law. 7 CMC § 3401.

involvement in the probate proceedings was primarily to harass Appellees and cause them to spend excessive legal fees.

¶ 72    Deferring to the trial court's finding that John's primary purpose was to harass Appellees and cause them to spend excessive legal fees, the question that remains is whether John's motive, and the actions he took to advance his motive, are the sort of misuse of process that the tort contemplates.

¶ 73    The trial court's factual findings reveal two overarching misuses of process that John engaged in: first, he made over five hundred pages of frivolous filings; second, he refused to sign up for the court's e-filing service or accept service by email, and then intentionally made himself unavailable when Appellees attempted to serve him personally with their responses to his many filings. The trial court drew the reasonable inference from these findings that John's purpose was to "dodge service in a blatant attempt to run out the clock or cause a deadline to expire." App. L at 8 (Order and Judgment).

¶ 74    Courts in other jurisdictions have found that the misuse of legal proceedings, when done for the illegitimate purpose of delay, harassment, or increasing the costs of litigation, are the sort of misuse of legal process that constitutes abuse of process. *See Durham v. Guest*, 204 P.3d 19, 26 (N.M. 2009) (finding that conduct intended to delay proceedings is an actionable improper purpose under the tort of Abuse of Process); *Rossi v. Rossi (In re Rossi)*, No. 98 A 01559, 1999 Bankr. LEXIS 435, at *30 (Bankr. N.D. Ill., Apr. 27, 1999) (finding that filing frivolous pleadings and dodging service for the purposes of delay and increasing litigation costs justify sanctions under Bankruptcy Rule 9011, which allows sanctions against parties who engage in legal process with an illegitimate purpose, to prevent an abuse of process); *Pundzak, Inc. v. Cook*, 500 N.W.2d 424, 430 (Iowa 1993) (finding that the primary purpose to "nickel and dime [a party] to death" can constitute an abuse of process under the Restatement).

¶ 75    Under the Restatement: "The usual case of abuse of process is one of some form of extortion, using the process to put pressure upon the other to compel him to pay a different debt or to take some other action or refrain from it." Restatement (Second) of Torts § 682 cmt. b. (1977). This is the "usual case" and should not be read too narrowly. The Restatement makes it clear that the "gravamen of the misconduct . . . is the misuse of process, no matter how properly obtained, for any purpose other than that which it was designed to accomplish." *Id.* at cmt. a. It does not matter whether John intended to deliberately delay and harass Appellees to cause their litigation expenses to rise so that he could reap the benefit of the land lease contract—$3.2 million dollars, or if he merely intended to delay, harass, and raise litigation costs to pressure Appellees to sign over their rights to the land itself. We find the Third Circuit's interpretation persuasive that "[t]he Restatement is concerned with individual legal processes primarily used for purposes for which they were not designed, . . . not whether they are used for purposes unconnected or unrelated to the

underlying litigation." *Gen. Refractories Co. v. Fireman's Fund Ins. Co.*, 337 F.3d 297, 306 (3d Cir. 2003).

¶ 76    Here, as the trial court laid out, John dodged service, delayed proceedings, and filed numerous frivolous and repetitive motions to harass the Appellees and increase their costs. The process of serving and being served motions and other papers during litigation is to provide parties with notice so that they may pursue their claim in court in good faith and timely resolve disputes. John's actions defied his purported interests in challenging the probate proceedings. This is an inappropriate ulterior purpose. Deferring to the trial court's factual findings and reasonably drawn inferences, the court did not abuse its discretion in finding abuse of process. Though we wish to avoid the chilling effect that a finding of abuse of process may have on an individual's choice to seek judicial recourse, we find that upholding the abuse of process judgment is necessary both to deter John's persistent, overzealous, and abusive relitigation of his claims, and to provide Appellees redress for the time they have spent being unjustly dragged through the courts. For these reasons, we affirm the trial court's judgment for abuse of process.

### E. We need not address tortious interference with contract.

¶ 77    The trial court also found John liable for tortious interference with contract. John's liability is based on the same actions that support his liability for abuse of process. App. L at 21–31 (Order and Judgment). Similarly, the damages John has been ordered to pay Appellees for tortious interference with contract are based on the same legal fees, to the cent, that they incurred as a result of the abuse of process. *Pangelinan v. Pangelinan*, No. 17-0067-CV (NMI Super. Ct. May 26, 2022) (Findings of Fact and Conclusions of Law Following Evidentiary Hearing Regarding Damages). Because we have upheld the court's finding of liability on the abuse of process claim, a decision on whether it properly applied the law to the facts in imposing liability for tortious interference with contract would not be outcome-determinative. For this reason, we decline to address the merits of the judgment for tortious interference with contract.

### F. The trial court was not biased.

¶ 78    The final issue John raises is that the lower court judge, Associate Judge Joseph N. Camacho, was biased against him, "requiring an automatic reversal" of all appealed orders and remanding to a different judge. Appellant's Br. at 5, 35. First, he alleges bias because the judge repeatedly ruled against him. Second, he claims bias because the judge's wife is co'mai're ("kumaire")[15] to Appellees' attorney. He says this information "came from the judge himself in the Probate Case." *Id.* at 35.

¶ 79    Under 1 CMC § 3308(b)(1), a judge shall disqualify himself "[w]here he or she has a personal bias or prejudice concerning a party[.]" 1 CMC § 3309(a),

---

15    This word is typically spelled "kumaire," meaning "Godmother, term of address used between mother and godmothers, or a father to a godmother. Also male' (short form)." *Kumaire*, CHAMORRO-ENGLISH DICTIONARY 117 (1st ed. 1975).

governs the procedure for section 3308 recusals and states that "[w]henever a justice or judge of the Commonwealth believes that there are grounds for his or her disqualification, he or she shall, on his or her own initiative, recuse himself[.]" We review a judge's decision not to recuse under an abuse of discretion standard. *Commonwealth v. Caja*, 2001 MP 6 ¶ 2.

¶ 80    John raises bias for the first time on appeal. Though we typically treat issues raised for the first time on appeal as waived, when it comes to recusal of judges, we have held that "applicable laws [1 CMC § 3308(a) and (b)(1)] place upon the judge himself, the obligation to identify the existence of grounds for recusal, rather than requiring recusal only in response to a party's motion." *Commonwealth v. Kaipat*, 1996 MP 20 ¶ 11; *see also Bank of Saipan v. Superior Court (Disqualification of Castro)*, 2002 MP 16 ¶¶ 15–16 (finding that failure to timely move to disqualify under 3308(b) does not constitute a waiver unless the untimeliness of the motion has the effect of delaying proceedings). Because 1 CMC §§ 3308 and 3309 place an affirmative obligation on judges to recuse themselves when they are aware of a reason for the disqualification, the failure to recuse raises a question of abuse of discretion and we will not consider the issue waived simply because a party raises it for the first time on appeal.

### i. The law does not require recusal under 1 CMC § 3308(b).

¶ 81    John's claim that the judge demonstrated bias by repeatedly ruling against him is an insufficient basis to allege that the judge abused his discretion under section 3308(b)(1). To succeed on this claim, the record must be totally devoid of any evidence to support the judge's decision not to recuse himself. *Robinson,* 1 NMI 81 at 89. John has alleged the rulings against him demonstrate bias generally, but there is ample evidence to support the judge's rulings. To further entertain the notion that a ruling—or even a series of rulings—disfavoring a party is an indication of bias, without additional evidence, requires greater conjecture than our standard of review permits.

¶ 82    The only particularized allegation of bias John raises is that Appellees' attorney has a non-consanguineous personal relationship with the judge's wife: specifically, that the judge's wife is kumaire to Appellees' attorney. Appellant's Br. at 35. The section of 1 CMC § 3308 that requires recusal when a judge's spouse has a relationship to an attorney in the case is section 3308(b)(5)(ii), which directs a judge to recuse when their spouse, or a person within the "second degree of relationship" to the judge's spouse is acting as a lawyer in the proceeding. The statute does not define what "second degree of relationship" is exactly, but 1 CMC § 3308(d)(2) clarifies that "degree of relationship is calculated according to the civil law system."

¶ 83    The civil law system measures degrees of relationship "from the person *a quo* upwards to the common stock, and then downwards to the other party

related."[16] *Smallman v. Powell*, 23 P. 249, 250 (Ore. 1890). Measured this way, a person has one degree of separation from their parents and children, and two degrees of separation from grandparents and siblings. *Id.*; *see also*, *United States v. D'Alfonso*, No. 03-746, 2008 U.S. Dist. LEXIS 41569 at *4 (E.D. PA May 27, 2008) (stating that according to the civil system, parent, child, grandparent, grandchild, great grandparent, great grandchild, sister, brother, aunt, uncle, niece and nephew, including whole and half-blood relatives, are within the third degree of relationship.) Importantly, all these relationships presuppose consanguinity. Other jurisdictions have interpreted statutes concerning degrees of relationship as implying consanguineous relationships unless the statute specifies otherwise. *See, e.g.*, *United States v. Dedman*, 527 F.3d 577, 589 (6th Cir. 2008) (interpreting a criminal statute to prohibit certain non-consanguineous relationships when the statute prohibited all marriages between certain family members "of every degree").

¶ 84    Though the kumaire relationship *may* be a consanguineous relationship within the second degree as calculated by the civil system, it is not always so., On its face, 1 CMC § 3308(b)(5) only requires recusal in circumstances when there is a consanguineous relationship within the second degree; it is not a "catch-all" provision. Instead, claims under section 3308(b) must fall under one of the categories listed in the subsection. The relationship petitioner alleges does not fall under any category of section 3308(b). Accordingly, we find no abuse of discretion in the judge's decision not to recuse under section 3308(b).

> *ii. Recusal under 1 CMC § 3308(a) is not necessary.*

¶ 85    1 CMC § 3308 has a waivable, catch-all provision in subsection (a), which requires a judge to recuse "in any proceeding in which his or her impartiality might reasonably be questioned." This section aims to avoid the appearance of impropriety, and requires a judge recuse whenever "a reasonable person with knowledge of all the facts would conclude that the judge's impartiality could be questioned." *In re Abraczinskas*, 2023 MP 12 ¶ 5.

¶ 86    In *Bank of Saipan*, we applied a 4-factor test to determine whether the untimely raising of a section 3308(a) claim constituted a waiver of the claim. 2002 MP 16 ¶ 19. This finding would appear to be in some tension with our statement in *Kaipat* that a judge has an affirmative duty to self-disqualify under section 3308(a), such that a failure to raise a section 3308(a) issue before appeal does not automatically constitute a waiver. 1996 MP 20 ¶ 11. However, the test we applied in *Bank of Saipan* aimed to ensure that a party's section 3308(a) *motion* would not unjustifiably cause delay or waste judicial resources. 2002 MP 16 ¶¶ 18–19. Because John made no motion under section 3308(a), the *Bank of Saipan* test is inapplicable.

---

[16]    This differs from the common law system of measuring degrees of relationship, which begins counting from the common ancestor. *Smallman v. Powell*, 23 P. 249, 250 (Ore. 1890).

¶ 87    We must still ask whether John *actually* waived his right to object under section 3308(a). John gives us little context for how and when he learned about the kumaire relationship. He states in his brief that the judge made the information known during the probate case. Appellant's Br. at 35. That the information came from the judge himself during the probate case suggests that the judge, aware of the possible appearance of impropriety, informed that parties about the relationship, offering parties the opportunity to object to his continued presence over the case. While this information suggests that John, either expressly or impliedly, waived his right to object under section 3308(a), the record lacks sufficient evidence for us to say so definitively.

¶ 88    However, John's admission that he has known since the probate proceedings that the judge's wife is kumaire to Appellee's attorney is enough for us to find on the merits there is no appearance of impropriety. There are only two facts present in the record that John has raised for a reasonable person to consider: (1) that the kumaire relationship exists; and (2) that the parties have known about the relationship since the probate proceedings, which concluded in December 2016. *See In re Estate of Norberto Eduardo Pangelinan*, No. 15-0169-CV (NMI Super. Ct. Dec. 19, 2016) (Decree of Final Distribution). One factor that would lead a reasonable person with knowledge of all the facts to conclude that a judge's impartiality could be questioned is whether the party claiming under section 3308(a) "has demonstrated a sincere belief that the assigned judge's continued presence over the case creates the appearance of impropriety." *Abraczinskas,* 2023 MP 12 ¶ 25. When a party unreasonably delays in moving for recusal under 1 CMC § 3308, while continuing to participate in proceedings presided over by the judge that the party claims cannot remain impartial, the party demonstrates a lack of a sincere belief in the judge's lack of impartiality. *Id.* at ¶¶ 34–36. This would affect a reasonable person's conclusions about the court's impartiality. *Id.* Here, despite knowing about the complained-of relationship since at least 2016, John has continued to participate in numerous actions before the judge, in this case and in the probate proceedings, seemingly without objection until this appeal. Appellant's Br. at 35. The contention that the court's non-recusal is so egregious that it requires automatic reversal of the lower court's rulings is contradicted by the failure to raise the issue previously, despite having every opportunity for years. This new argument alleging bias fails. There is no basis to require the judge to recuse himself based on an appearance of impropriety in this case.

*G. Appellant has waived the remaining issues through insufficient argument.*

¶ 89    In his brief and at oral argument, John failed to discuss many of the decisions he appeals. We have consistently held that issues insufficiently developed by parties will not be addressed because of the nature of our adversarial system. As a reviewing court, we are not a "self-directed board[] of legal inquiry and research, but essentially . . . arbiters of legal questions presented and argued by the parties before [us]." *Commonwealth v. Borja*, 2018 MP 13 ¶ 16 n.4 (internal quotations omitted). In certain cases, we may exercise our discretion to review issues raised on appeal unsupported by relevant argument if they are

well-taken on their face. *Lucky Dev. Co., Ltd. v. Tokai, U.S.A., Inc.*, 3 NMI 79, 93 (1992). But our general rule is "when a party does not ground a legal proposition in any legal authority, the issue is waived." *Atalig v. Mobil Oil Mariana Islands, Inc.*, 2013 MP 11 ¶ 32.

¶ 90    John has waived appeal of the following decisions by failing to argue them:

(a) Order After July 16, 2019 Hearing, dated August 15, 2019;
(b) Order, which directs the Plaintiffs to file their request for damages and/or other remedies, dated May 21, 2020;
(c) Order After Hearing, dated January 6, 2021;
(d) Order Stating that the CNMI Superior Court's Jurisdiction Over This Civil Action Was Divested When the "Notice of Appeal" was Filed with the CNMI Supreme Court, dated May 5, 2021;
(e) Order Overruling Defendant's Objection to Rescheduling of Evidentiary Hearing, dated May 26, 2022;
(f) Order Overruling and Denying Defendant's Objections and Motions Seeking to Dismiss/Vacate Evidentiary Hearing, dated May 26, 2022;
(g) Findings of Fact and Conclusions of Law Following Evidentiary Hearing Regarding Damages, dated May 26, 2022;
(h) Judgment and Order, dated May 26, 2022;
(i) Order After July After July 12, 2022 Motion Hearing on Defendant's Motion for Reconsideration, dated July 21, 2022;
(j) Order Denying Defendant's Motion Filed on July 18, 2022, dated July 21, 2022;
(k) Entry of Final Judgment dated July 21, 2022; and
(l) Notice and Order dated August 11, 2022.

## V. CONCLUSION

¶ 91    We AFFIRM the dismissal of John's quiet title counterclaim on the basis of issue preclusion. All claims and arguments by John, premised on the assertion that Norberto Eduardo Pangelinan was not of Northern Marianas descent and Jose Wilson Pangelinan was not a citizen of the Trust Territory of the Pacific Islands for purposes of Article XII of the NMI Constitution are barred under the doctrine of issue preclusion. Accordingly, we AFFIRM the dismissal and denial of the many motions premised on the same precluded issue. We AFFIRM the dismissal of the libel counterclaim for failure to state a claim upon which relief could be granted. We AFFIRM the setting aside of the entry of default. We AFFIRM the judgment finding liability for abuse of process and we decline to address the challenge of the lower court's judgment finding John liable for tortious interference with contract. Finally, because the judge did not abuse his discretion by not recusing, the request to reverse the judgments and orders of the lower court is DENIED.

So Ordered this 23rd day of September, 2024.


  /s/
PERRY B. INOS
Associate Justice


  /s/
ROBERT J. TORRES, JR.
Justice Pro Tempore


  /s/
WESLEY M. BOGDAN
Justice Pro Tempore

COUNSEL

John S. Pangelinan, Saipan, MP, Appellant, Pro Se.

Janet H. King, Saipan, MP, for Appellees.


*NOTICE*

*This slip opinion has not been certified by the Clerk of the Supreme Court for publication in the permanent law reports. Until certified, it is subject to revision or withdrawal. In any event of discrepancies between this slip opinion and the opinion certified for publication, the certified opinion controls. Readers are requested to bring errors to the attention of the Clerk of the Supreme Court, P.O. Box 502165 Saipan, MP 96950, phone (670) 236–9715, fax (670) 236–9702, e–mail Supreme.Court@NMIJudiciary.com.*

E-FILED
CNMI SUPREME COURT
E-filed: Sep 23 2024 04:24PM
Clerk Review: Sep 23 2024 04:25PM
Filing ID: 74558722
Case No.: 2022-SCC-0016-CIV
Judy  Aldan



IN THE

# Supreme Court

OF THE

# Commonwealth of the Northern Mariana Islands

---

**SECUNDINA UNTALAN PANGELINAN AND SELINA MARIE PANGELINAN,**
*Plaintiffs-Appellees*,

**v.**

**JOHN SABLAN PANGELINAN,**
*Defendant-Appellant*.

---

**Supreme Court No. 2022-SCC-0016-CIV**
Superior Court No. 17-0067-CV

**JUDGMENT**

Defendant-Appellant John Sablan Pangelinan appeals the trial court's orders dismissing his counterclaims for quiet title and libel. He also appeals the trial court's judgment finding him liable for abuse of process and tortious interference with contract, as well as the trial court's setting aside of the entry of Appellees' default. For the reasons discussed in the accompanying opinion, the Court AFFIRMS the trial court, declining to reach the issue of tortious interference with contract, finding that issues not sufficiently argued on appeal are waived, and denying Appellant's request to disqualify and reverse the trial court judge.

ENTERED this 23rd day of September, 2023.


 /s/
_____
JUDY T. ALDAN
Clerk of the Supreme Court